## ILLINOIS CENTRAL RAILROAD COMPANY *v.* ILLINOIS.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 217.  Argued April 14, 15, 1896.—Decided May 18, 1896.

The act of Congress of September 20, 1850, c. 61, granted a right of way, and sections of the public lands, to the State of Illinois, and to States south of the Ohio River, to aid in the construction of a railroad connecting the waters of the Great Lakes with those of the Gulf of Mexico, and over which the mails of the United States should be carried. The State of Illinois accepted the act, and incorporated the Illinois Central Railroad Company, for the purpose of constructing a railroad with a southern terminus described as "a point at the city of Cairo." The company accordingly constructed and maintained its railroad to a station in Cairo, very near the junction of the Ohio and Mississippi Rivers; but afterwards, in accordance with statutes of the United States and of the State of Illinois, connected its railroad with a railroad bridge built across the Ohio River opposite a part of Cairo farther from the mouth of that

river; and put on a fast mail train carrying interstate passengers and the United States mails from Chicago to New Orleans, which ran through the city of Cairo, but did not go to the station in that city, and could not have done so without leaving the through route at a point three and a half miles from the station and coming back to the same point; but the company made adequate accommodation by other trains for interstate passengers to and from Cairo. Cairo was a county seat. *Held*, that a statute of Illinois, requiring railroad companies to stop their trains at county seats long enough to receive and let off passengers with safety, and construed by the Supreme Court of the State to require the fast mail train of this company to be run to and stopped at the station in Cairo, was, to that extent, an unconstitutional hindrance and obstruction of interstate commerce, and of the passage of the mails of the United States.

THIS was a petition for a writ of mandamus, based upon the Revised Statutes of Illinois of 1889, c. 114, § 88, which is as follows:

"Every railroad corporation shall cause its passenger trains to stop upon its arrival at each station, advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off such passengers with safety: Provided, all regular passenger trains shall stop a sufficient length of time, at the railroad station of county seats, to receive and let off passengers with safety."

The petition was filed April 17, 1891, in the circuit court for Alexander county in the State of Illinois, by the county attorney in behalf of the State, alleging that the Illinois Central Railroad Company ran its south-bound fast mail train through the city of Cairo, two miles north of its station in that city, and over a bridge across the Ohio River connecting its road with other roads south of that river, without stopping at its station in Cairo; and praying for a writ of mandamus to compel it to cause all its passenger trains, coming into Cairo, to be brought down to that station, and there stopped a sufficient length of time to receive and let off passengers with safety.

The defendant contended that the statute did not require its fast mail train to be run to and stopped at its station in Cairo; and that the statute was contrary to the Constitution

of the United States, as interfering with interstate commerce, and with the carrying of the United States mails.

By the act of Congress of September 20, 1850, c. 61, entitled "An act granting the right of way and making a grant of land to the States of Illinois, Mississippi and Alabama, in aid of the construction of a railroad from Chicago to Mobile," the right of way through the public lands, with the right to take earth, stones and timber necessary for the construction of the road, was "granted to the State of Illinois for the construction of a railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi Rivers, with a branch of the same to Chicago on Lake Michigan, and another via the town of Galena in said State to Dubuque in the State of Iowa;" and a copy of the survey of the road and branches, made under direction of the legislature, was required to be forwarded to the proper land office, and to the general land office in the city of Washington. By §§ 2–4, alternate sections of land on each side of the road were granted to the State of Illinois, "subject to the disposal of the legislature thereof, for the purposes aforesaid, and no other; and the said railroad and branches shall be and remain a public highway, for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States." By § 6, "the United States mail shall at all times be transported on the said railroad, under the direction of the Post-Office Department, at such price as the Congress may by law direct." And by § 7, "in order to aid in the continuation of said Central Railroad from the mouth of the Ohio River to the city of Mobile," similar grants of "rights, privileges and liabilities," and of lands, were made "to the States of Alabama and Mississippi respectively, for the purpose of aiding in the construction of a railroad from said city of Mobile to a point near the mouth of the Ohio River." 9 Stat. 466.

The legislature of Illinois, by the statute of February 10, 1851, incorporated the Illinois Central Railroad Company, and empowered it "to survey, locate, construct, complete, alter, main-

tain and operate a railroad, with one or more tracks, from the southern terminus of the Illinois and Michigan Canal to a point at the city of Cairo, with a branch of the same to the city of Chicago on Lake Michigan, and also a branch via the city of Galena to a point on the Mississippi River opposite the town of Dubuque in the State of Iowa;" and by § 15, for that purpose only, ceded and granted to that corporation the right of way and lands granted to the State by the act of Congress of September 20, 1850; and required "the main trunk thereof, or central line, to run from the city of Cairo to the southern termination of the Illinois and Michigan Canal," "and nowhere departing more than seventeen miles from a straight line between" those two points; and required the corporation to mortgage said right of way and lands to the State of Illinois to secure the application of the proceeds of those lands "to the constructing, completing, equipping and furnishing said road and branches, in accordance with the terms of this act, and said act of Congress;" and by § 19, declared "said road and branches to be free for the use of the United States, and to be employed by the Post-Office Department, as provided in said act of Congress." Illinois Private Laws of 1851, pp. 61, 66, 68, 71. And by § 3 of the statute of Illinois of February 17, 1851, that act of Congress was expressly "accepted, and the conditions expressed in said act are hereby agreed to, and made obligatory upon the State of Illinois." Illinois General Laws of 1851, p. 192.

By the statute of Illinois of February 2, 1855, "all railroad companies incorporated or organized under, or which may be incorporated or organized under, the authority of the laws of this State, shall have power to make such contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof; and also to contract for and hold, in fee simple or otherwise, lands or buildings in this or other States for depot purposes; and also to purchase and hold such personal property, as shall be necessary and convenient for carrying into effect the object of this act;" and "shall have the right of connecting with each other, and with the railroads of other

States, on such terms as shall be mutually agreed upon by the companies interested in such connection." And by the statute of Illinois of February 25, 1867, "railroads terminating or to terminate at any point on any line of continuous railroad thoroughfare, where there now is or shall be a railroad bridge for crossing of passengers and freight in cars over the same as part of such thoroughfare, shall make convenient connections of such railroads, by rail, with the rail of such bridge; and such bridge shall permit and cause such connections of the rail of the same with the rail of such railroads, so that by reason of such railroads and bridge there shall be uninterrupted communication over such railroads and bridge as public thoroughfares; but by such connections no corporate rights shall be impaired." 2 Starr & Curtis's Statutes of Illinois, pp. 1921, 1922.

By the act of Congress of June 15, 1866, c. 124, entitled "An act to facilitate commercial, postal and military communication among the several States," and having this preamble, "Whereas the Constitution of the United States confers upon Congress, in express terms, the power to regulate commerce among the several States, to establish post-roads, and to raise and support armies: Therefore," it is enacted "that every railroad company in the United States, whose road is operated by steam, its successors and assigns, be and is hereby authorized to carry upon and over its road, boats, bridges and ferries, all passengers, troops, government supplies, mails, freight and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of its destination: Provided, that this act shall not affect any stipulation between the government of the United States and any railroad company for transportation or fares without compensation, nor impair or change the conditions imposed by the terms of any act granting lands to any such company to aid in the construction of its road; nor shall it be construed to authorize any railroad company to build any new road, or connection with any other road, without authority from the State in which

said railroad or connection may be proposed;" and "that Congress may at any time alter, amend or repeal this act." 14 Stat. 66.

By the act of Congress of December 17, 1872, c. 4, amended by the supplementary act of February 14, 1883, c. 44, "any person or corporation, having lawful authority therefor, may hereafter erect bridges across the Ohio River, for railroad or other uses, upon compliance with the provisions and requirements of this act," among which are that they shall be built of a certain height above low water mark, and at places and according to plans approved by the Secretary of War; and any bridge constructed under and according to this act is declared to be a lawful structure, to be recognized and known as a post route; and for the transmission over which of the mails, the troops and the munitions of war of the United States, no higher charge is to be made than the rate per mile over the railroads or public highways leading to it; and across which the United States are to have the right of way for postal telegraph purposes. 17 Stat. 398; 22 Stat. 414.

The city of Cairo is situated upon the point of land at the junction of the Mississippi and Ohio Rivers, and is surrounded by high levees to protect it from the river floods; and since 1859 has been a county seat. In 1855, the defendant completed the location and building of its road, and laid and since maintained its track to the bank of the Ohio River, then taking a sharp turn westward, and passing, in the city of Cairo, for the distance of two miles along the Ohio Levee embankment, to a place, less than half a mile from the junction of the waters of the two rivers, and at the intersection of Second and Ohio Levee streets, where its only passenger station in Cairo was established; and until a few months before the filing of the petition ran all its passenger trains to and from that station, and made it the southern terminus of its railroad.

By the statute of Kentucky of March 29, 1886, c. 446, the Chicago, St. Louis and New Orleans Railroad Company and the Illinois Central Railroad Company were authorized "jointly, or either of them separately, to build, erect, construct, and forever maintain, use and operate a railroad bridge

over and across the Ohio River from the Kentucky shore, in Ballard County, opposite the city of Cairo, to any point in the city of Cairo, Illinois," conformably to the conditions and limitations of the acts of Congress of 1872 and 1883, above cited.

Pursuant to that statute, the Chicago, St. Louis and New Orleans Railroad Company, into which various railroad corporations had been consolidated by statutes of the States of Louisiana, Mississippi, Tennessee and Kentucky, and whose line extended from New Orleans to the Ohio River, built a bridge across the Ohio River to low water mark on the Illinois side, to which the jurisdiction of the State of Kentucky extended. *Indiana* v. *Kentucky*, 136 U. S. 479. The north end of this bridge was at that part of Cairo about two miles north of the defendant's station in that city; and the peculiar conformation of the land and water made it impracticable to put it nearer to the junction of the two rivers. The height at which the bridge had to be built, in order to avoid obstructing navigation, required the approaches on both banks to be graded. The approach on the Illinois side was built by the defendant, upon its own land, at the grade of 35 feet to a mile, and beginning a mile and a half off, at Bridge Junction, beyond the corporate limits of Cairo.

After this bridge was built, and the defendant's road was thereby connected with the Chicago, St. Louis and New Orleans Railroad, the defendant put on a daily fast mail train, to run from Chicago to New Orleans, carrying passengers, as well as the United States mail, not going to or stopping at its station in Cairo, but connecting, at a point some nine miles out on the main line, with a short train from that station.

Trains passing over the through route from Chicago to New Orleans, and stopping at Cairo, are obliged to leave the main line at Bridge Junction, and to run down three and a half miles to the Cairo station, and back to the same point on the main line. Six regular passenger trains were so run daily, giving adequate accommodations for passengers to or from Cairo.

The defendant offered to prove that the schedule of run-

ning time of the fast mail train had been fixed by the Post-Office Department of the United States, and could not be changed by the defendant. The court excluded the evidence, " for the reason that it is not competent for the defendant to enter into the contract with the government of the United States, whereby it renders itself incapable of complying with the laws of Illinois; " and allowed an exception to this ruling.

The court granted a writ of mandamus, commanding the defendant to cause its south-bound fast mail train, and all its other passenger trains coming into Cairo, to be run or brought down to its passenger station at the intersection of Ohio Levee and Second streets, and there to be stopped a sufficient length of time to receive and let off passengers with safety.

The defendant appealed to the Supreme Court of the State, which affirmed the judgment; and held that the statute of Illinois concerning the stopping of trains obliged the defendant to cause its fast mail train to be taken into its station at Cairo, and be stopped there long enough to receive and let off passengers with safety; and that the statute, so construed, was not an unconstitutional interference with interstate commerce, or with the carrying of the United States mails. 143 Illinois, 434. The defendant sued out this writ of error.

*Mr. William H. Green* and *Mr. James Fentress* for plaintiff in error.

*Mr. John M. Lansden,* (with whom was *Mr. Angus Leek* on the brief,) for defendant in error.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The line of railroad communication, crossing the Ohio River at Cairo, and of which the Illinois Central Railroad forms part, has been established by Congress as a national highway for the accommodation of interstate commerce and of the mails of the United States, and as such has been recognized and promoted by the State of Illinois. This will clearly

appear by a brief recapitulation of the acts of Congress and the statutes of Illinois upon the subject.

Congress, in the act of September 20, 1850, c. 61, granted a right of way, and sections of the public lands, to the State of Illinois, to aid in the construction of a railroad in that State from the southern termination of the Illinois and Michigan Canal " to a point at or near the junction of the Ohio and Mississippi Rivers," with branches to Chicago and Dubuque, "to be and remain a public highway, for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States," and on which the United States mail should "at all times be transported, under the direction of the Post Office Department, at such price as the Congress may by law direct;" and, in order " to aid in the construction of said Central Railroad," made like grants to the States of Alabama and Mississippi, respectively, for the purpose of aiding in the construction of a railroad from the city of Mobile " to a point near the mouth of the Ohio River."    9 Stat. 466.

The manifest purpose of Congress was to establish a railroad in the centre of the Continent, connecting the waters of the Great Lakes with those of the Gulf of Mexico, for the benefit of interstate commerce, as well as of the military and postal departments of the government of the United States.

. The State of Illinois, by a statute of February 10, 1851, chartered the Illinois Central Railroad Company, and ceded to it the rights and lands granted to the State by the act of Congress, for the purpose of constructing and maintaining within the State such a trunk line and branches, describing its southern terminus as " a point at the city of Cairo," and declaring " said road and branches to be free for the use of the United States, and to be employed by the Post-Office Department, as provided in said act of Congress ;" and (as if that were not sufficient) by another statute, a week later, the State expressly accepted the act of Congress, and agreed to be bound by the conditions expressed therein.

By the statute of Illinois of February 2, 1855, all railroad corporations of the State were empowered to make contracts

with each other, and with railroad corporations of other States, for leasing, or running, or connecting their railroads; and by the statute of Illinois of February 25, 1867, railroads terminating at a point at which there was a railroad bridge on a line of continuous railroad thoroughfare were required to be connected by rail, as to make "an uninterrupted communication over such railroads and bridge as public thoroughfares."

By the act of June 15, 1866, c. 124, Congress, for the declared purpose of facilitating commerce among the several States, and the postal and military communications of the United States, authorized every railroad company in the United States, whose road was operated by steam, to carry over its road, bridges and ferries, as well passengers and freight, as government mails, troops and supplies, from one State to another; and to connect, in any State authorizing it to do so, with roads of other States, so as to form continuous lines of transportation. 14 Stat. 66.

By the acts of Congress of December 17, 1872, c. 4, and February 14, 1883, c. 44, bridges were authorized to be built across the Ohio River by any person or corporation, having lawful authority therefor, and with the approval of the Secretary of War; and were declared to be lawful structures and post routes for the transmission of the mails and the troops and munitions of war of the United States. 17 Stat. 398; 22 Stat. 414.

It is not denied that the bridge across the Ohio River from the Kentucky shore to the Illinois shore, opposite the city of Cairo, was constructed by lawful authority, and as permitted by Congress. Nor is it denied that the Illinois Central Railroad Company had the right, under the acts of Congress and the statutes of Illinois, to connect its road with that bridge, and to run its southward bound trains over that bridge as part of a system of interstate communication.

But it is contended, on behalf of the State of Illinois, that the station of the Illinois Central Railroad Company, at the southern terminus of its road in the city of Cairo, having been originally established, and still remaining, at a point some three and a half miles from so much of its main line as forms

part of the through communication by railroad from the State of Illinois across the Ohio River to the State of Kentucky and other Southern States, the corporation is obliged, by a statute of the State of Illinois, to cause all its trains, including the fast mail train from Chicago to New Orleans, to be brought down to that station, and to stop there long enough to receive and let off passengers with safety.

The statute in question is as follows: "Every railroad corporation shall cause its passenger trains to stop upon its arrival at each station, advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off such passengers with safety: Provided, all regular passenger trains shall stop a sufficient length of time, at the railroad station of county seats, to receive and let off passengers with safety." Illinois Rev. Stat. of 1889, c. 114, § 88.

It was argued, in behalf of the railroad company, that the whole effect of this section, was to require each train " to stop upon its arrival" at a station, long enough to receive and let off passengers with safety; that the first part of the section only required trains to stop upon arrival " at each station advertised as a place for receiving and discharging passengers upon and from such trains;" that the proviso merely required trains to stop, for a like time, on arriving at " the railroad station of county seats," although not so advertised; and that no part of the section required any train to arrive at, or to go to, any particular station.

The Supreme Court of the State, however, held that the statute not only required every train to stop at every county seat at which it arrived, but that, as Cairo was admitted to be a county seat, the statute required every train passing through the city of Cairo to go to and stop at the station in that city. The construction given to the statute in this particular by the state court does not involve any Federal question, and must be accepted by this court in judging of the constitutionality of the statute. *Chicago &c. Railway* v. *Minnesota*, 134 U. S. 418, 456.

But the decision that the statute, so construed, was not an unconstitutional interference with interstate commerce, or

with the carrying of the mails by the United States, was a decision in favor of the validity of a state statute whose validity was drawn in question on the ground of its being repugnant to the Constitution and laws of the United States, as well as a decision against a right specially set up and claimed under the national Constitution and laws; and is therefore clearly reviewable by this court.

The effect of the statute of Illinois, as construed and applied by the Supreme Court of the State, is to require a fast mail train, carrying interstate passengers and the United States mail, from Chicago in the State of Illinois to places south of the Ohio River, over an interstate highway established by authority of Congress, to delay the transportation of such passengers and mails, by turning aside from the direct interstate route, and running to a station three miles and a half away from a point on that route, and back again to the same point, and thus travelling seven miles which form no part of its course, before proceeding on its way; and to do this for the purpose of discharging and receiving passengers at that station, for the interstate travel to and from which, as is admitted in this case, the railroad company furnishes other and ample accommodation.

This court is unanimously of opinion that this requirement is an unconstitutional hindrance and obstruction of interstate commerce, and of the passage of the mails of the United States.

Upon the state of facts presented by this record, the duties of the Illinois Central Railroad Company were not confined to those which it owed to the State of Illinois under the charter of the company and other laws of the State; but included distinct duties imposed upon the corporation by the Constitution and laws of the United States.

The State may doubtless compel the railroad company to perform the duty imposed by its charter of carrying passengers and goods between its termini within the State. But so long, at least, as that duty is adequately performed by the company, the State cannot, under the guise of compelling its performance, interfere with the performance of paramount

duties to which the company has been subjected by the Constitution and laws of the United States.

The State may make reasonable regulations to secure the safety of passengers, even on interstate trains, while within its borders. But the State can do nothing which will directly burden or impede the interstate traffic of the company, or impair the usefulness of its facilities for such traffic. *Railroad Co.* v. *Richmond,* 19 Wall. 584, 589; *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307, 334; *Smith* v. *Alabama,* 124 U. S. 465.

It may well be, as held by the courts of Illinois, that the arrangements made by the company with the Post-Office Department of the United States cannot have the effect of abrogating a reasonable police regulation of the State. But a statute of the State, which unnecessarily interferes with the speedy and uninterrupted carriage of the mails of the United States, cannot be considered as a reasonable police regulation.

In *Union Pacific Railroad* v. *Hall,* 91 U. S. 343, cited by the counsel for the State, the writ of mandamus was issued to promote, not to defeat, interstate transportation.

The question whether a statute which merely required interstate railroad trains, without going out of their course, to stop at county seats, would be within the constitutional power of the State, is not presented, and cannot be decided, upon this record.

The result is that the judgment of the Supreme Court of the State, which requires the Illinois Central Railroad Company to cause its fast mail train to be brought into and stopped at its station in Cairo, is erroneous, and must be

*Reversed, and the cause remanded for further proceedings not inconsistent with this opinion.*